Good morning, and may it please the Court. My name is Palmer Huvestal. I'm an attorney from Helena, Montana. I'm appearing on behalf of the appellant. I'd like to utilize 13 minutes opening and 2 minutes in rebuttal. Okay, and as you can see, the clock comes down. We'll try to help you keep track of your time, but it's on you to make sure you're watching. Your Honor, the issue that I'd like to argue today is the District Court's refusal to allow Defense Counsel to cross-examine Tom Green, the victim's brother, about facts that would have elicited an intent to kill his brother or a motive to kill his brother. Mr. War Club was charged with the offense of first-degree murder. His defense was that somebody else did it, and that other individual was Richard Cumslast. We could have established evidence that directly connected the excluded evidence, that is, the fact that Richard Green had raped Mr. Tom Green's then-girlfriend and that Tom Green brought Richard Green out to the country with a gun and intending to shoot him. They had a discussion there. Mr. Green, that is, Tom Green, decided not to kill him. He forgave him because Gail Green forgave him as well, and then they subsequently married. That is, Gail and Tom subsequently married. Throughout the course of the marriage, this rape was a problem. It was a bone of contention between Tom Green and Gail Green and eventually ended up being the basis for their divorce in 2004, which was simply two years prior to the death of Richard Green. Now, the evidence that we would have utilized to connect this excluded evidence to the murder was this. Richard Cumslast, we established at trial, was at Richard Green's house, the victim, when or about when Richard Green was killed. The crime scene photos expressly showed Mr. Green face down on his garage floor. He had a black hose, a black air hose that was connected to an air compressor, a blue air compressor that was behind him. And there was a silver portable air tank next to him. And so from that evidence and from those depictions in the record, we argued at trial that Richard Cumslast was there at the time that he was killed. The other evidence was that Richard Cumslast was going to be there at 10 o'clock a.m., the time that we think that he was killed, because he had the specific purpose of going to charge up this portable air tank with air and fill the tires of a red Ford Tempo that Richard Green had sold to a man named Harold Glead. Richard Green was a pawnbroker. He was also a car dealer. So in his capacity as a pawnbroker, he sold this red Ford Tempo to this man named Harold Glead. And in his capacity as a car dealer, the night before Richard Cumslast, and he made arrangements for Cumslast to come to his house and get the vehicle ready to be sold. And it had a flat tire. And it had two, yes, one flat tire, and I think the other was going flat, and it had to be sold. So I'm just articulating your spinning out of the theory, and the reason he's filling up the tank is that he needs to fill out the tire so the car or vehicle can be driven away. Exactly. But it was Tom Green who brought the gun out in the desert. It was Tom Green's divorce. So what linked Richard Cumslast to Tom Green? Well, this is the substantial evidence that we contend links the crime with the excluded evidence. First, Richard Cumslast worked for Tom Green, and I think the evidence was that he would do anything that Tom Green wanted him to do except for electricity. He wouldn't do electricity. Secondly, he had a personal and private relationship with Tom Green. He considered Tom Green to be his father. He considered Dick Green to be his best friend. Yes, which relates. So he's going to kill his best friend, not because he's asked to by his other best friend, but because he thinks, you know, as a trial judge, I just find this so attenuated. You were able to show that Cumslast was there and had an opportunity to kill. In fact, you showed that there might be some motive to kill, albeit a small amount of money. You were able to show all that. And what you're doing is trying to give him the brother's motive to kill. Yes. And if I might continue, the connecting evidence is that after Mr. Cumslast talked on the telephone with Stacy Headress, Richard Green's daughter, and heard her cry out in anguish when she discovered her father, and this is another issue that's up on appeal that we're asking the Court to review. Mr. Cumslast called Tom Green first before he called 911. And we think that that's – it's highly suspicious. In other words, if all of a sudden he finds out that Richard Green has passed away, he would call 911 first. And that's not what he told law enforcement. Now, does he know – I shouldn't say that no is a hard word here. When he hears from Stacy over the telephone that she's found her father's body in the garage, the reason for a 911 call either could be, you know, bring out the coroner's van or whatever, or it could be, you know, all he knows is the bloody body's out there and maybe he's still alive. So 911, get the EMT guys out there. Right. But in either event, your argument is, but if you're going to call 911, why do you call Tom first? Especially why do you call Tom first if the 911 call is to get EMT out there? Do we have anything in the record as to what was said on the 911 call? Did he say there's somebody dead out there or there's somebody – get your EMT guys out there? No, we don't, Your Honor. We just know 911 was called? Yes. Okay. And it's exceedingly odd or suspicious in the eyes of the defense that he called Tom Green first. The second issue is Tom Green lingered at this meeting that he was at upon hearing that his brother was dead or had passed away. He lingered there for I think the record is approximately 10 minutes before he decided to make his way to the scene. And while he was at the scene, he basically stood with Richard Green the whole time, or part of the time. Anyway, that's the record. I'm sorry, say that again. I may be a tangling who's doing what to whom. He stood next to Richard Green. Start out the delay. Who's delaying and where is the person while he's delaying and so on? Just start that narrative again for me. Richard comes last, finds out that Richard Green is dead. He calls Tom Green. Tom Green is at a meeting somewhere, and Tom Green lingered at the meeting for 10 minutes, about 10 minutes, after hearing that his brother had been killed. And we contend that the fact that he lingered was suspicious in nature. In other words, I think that a reasonable person would not have lingered upon hearing that his brother had been killed. He would have said, I got to go, and gone. The President of the United States kept reading a story about a goat for quite a long time after being notified of 911. Yes, and I thought about that as well. That didn't signify guilt. It might have signified, I got to think about this for a minute, absorb the news. Whatever. What was the interval between the 911 call and the prior call to Tom Green? Your Honor, I don't know that. I don't know what the interval was. So if you discovered somebody you knew, well, dead, clearly dead, and you had a relationship with his brother who was your mentor, why is it illogical for him to call the brother first and then call 911 if the person is dead? Well, I don't think that he necessarily knew that he was dead. He heard Stacey Headress scream. Well, according to our theory, he did know that he was dead and that he called 911 solely as a pretext to cast suspicion away from him. Your theory is he's trying to pretend that he's not sure. All he knows is that he's got a scream from the daughter and he's trying to play a sort of good person getting 911 there promptly. That's your argument? Yes. Yes, Your Honor. I don't know. Let me go at it this way. I mean, I'm sympathetic to your argument in this sense. You clearly were prevented by the district judge's ruling from putting out the full extent of the factual scenario that you wanted that would have been the defense. That is to say, the defense is somebody else did it or there's enough evidence that somebody else did it that you can't decide beyond a reasonable doubt that War Club did it. And you had more facts supporting your story than you were allowed to put on. I understand that. The evidence against War Club, however, is fairly strong. We've got evidence from Douglas that he drops him off at that house, although the timing is a little odd because Douglas gets confused, so I'm not sure exactly when, but he's pretty consistent. We have testimony from at least two people that War Club, in the day or two immediately following the killing, is spending amounts of cash that he didn't previously have. There was a third person who was sympathetic to War Club who can't specify the dates very well. We've got the fiber evidence of the T-shirt, and we've got the hair evidence. Both of those are forensic evidence things, and I have to say in recent years I've learned more and more about forensic, quote, science, close quote. It makes me worry about that kind of evidence, but nonetheless the evidence is there. We have the hearsay evidence that I think shouldn't have been admitted that tells us that Green was increasingly worried about War Club. I don't know whether I'm supposed to pretend for purposes of harmless error that it was in or that it wasn't in, but that seemed to me that that was improperly admitted. We have the evidence that War Club owed $2,000 to Green. We have evidence that he was feeding a drug addiction. The evidence against War Club, I mean, was pretty good. So what's our chance that if you'd been able to flesh out your story as fully as you would like to do it, that you could have changed that outcome? And I guess I'll add to that question. Assuming that we find an error by the district judge, that is to say assuming that we find the district judge should have allowed, as part of allowing you to put on the defense, this testimony about Green, what's the standard under which we review harmless error? The standard under which you review harmless error. Was I too meandering in that question? No, but I can respond to some of the evidentiary questions. As to Mr. Douglas, Mr. Kumslaz did not testify that he saw War Club or anybody there at the residence. And he testified that Mr. Green was punctual. He arrived at 10 o'clock and he stayed there between 20 to 30 to 40 minutes. And if Douglas is telling the truth, War Club should have been there. War Club should have been there. As to the other witnesses who stated that they had, that they found, that they saw Mr. War Club with large amounts of money, this homicide occurred in 2006. These witnesses were interviewed by the FBI approximately 20 months later. And I thought a couple of them had their memories refreshed on the stands by reports they had made to the FBI in May, a month after. Am I misreading the record? I think that Mr. Douglas was one of those. I don't know that the other ones were, but I know that was a ---- I thought both Garfield and Devereaux, Garfield more clearly than the other, but I thought Garfield specifically was given a May 5 report done by an FBI interviewer that is a May report that was prepared a month after the killing. And that refreshed her memory. You can correct me if I'm misreading the record on that point. Well, I think you are, Your Honor. I think that there were a few. I don't think you're misreading the record. I think you're correct. I think that there were a few of the witnesses who, in fact, were interviewed subsequent to that. Yeah. I mean, I viewed the testimony of Haugen as to the timing as very imprecise. Partly she was sympathetic to War Club, too. She didn't want to be very precise. She'd gotten some money, hadn't she, from the settlement? That's what I understand. Yes. His settlement, he received about $38,000, almost $39,000, and I think he received that love son settlement in July of 2006. And that was how long after the murder? May, June, July, three months, four months. Actually, he testifies he got it in August. Something like that. And as to the fiber in the hair, it was, again, our contention that the crime scene was so contaminated. There were numerous people there, and the fiber in the hair could have come from anybody. And the fiber, of course, the government's experts could not actually state affirmatively that this fiber came from this shirt, and they could not affirmatively state that this hair came from Mr. War Club's daughter. I mean, hair from the daughter of the murder victim at the murder scene, nobody's ever arguing that the daughter was ever there, and it's unclear to me how precise the correlation is and how many people are excluded. I found that hair of it is profoundly sort of unconvincing, but maybe the government can persuade me otherwise. I think the argument was it was like maybe brushing against a dog or a cat, and the dog hair or the cat hair is then transferred to the crime scene. Right. I understand that. But I have trouble understanding, even accepting that it was a hair that should be compared to the daughter's hair, I have trouble understanding sort of precision or data, the chances that it was, in fact, from the daughter in terms of racial groups. I just found that evidence very difficult to understand. That's right. I see my time's up. Let's hear from the government. We have a chance to respond. Good morning. Laurie Sook for the United States. We do believe that the evidence was too attenuated and the judge had and didn't make a mistake, but before we get into that argument, it's important to understand the strength of the government's case   in understanding the strength of the government's case. It's an overlay with respect to every one of these errors. So it's important. Don't let me interrupt you. Okay. If you can present it in the order you think is going to work best for you.     It's an overlay with respect to every one of these errors. He specifically said that he had an appointment for blood work at 5 to 10, and that before that all happened is when he had his connection with Mr. War Club and the suspicious asking him to drop him off at different locations and then dropping him off. And that's at Excerpt of Record 3289. So it's inaccurate to say that he would have seen War Club there already. Maybe, maybe not. I read the entire portion of the transcript of the Douglas testimony. His timeline just goes all over the map in terms of whether he picked him up before, picked him up afterwards, the narrative in terms of what he says he did, going to his sister's, picking up War Club, driving him to these various places in War Club, Cheating Town, I don't want to be there, and then he drives past, and then him doing that all before he goes to his lab work at 10 o'clock. That's going to be hard to fit all those things into that time frame, and he then says things that are consistent with what's happening afterwards. I view this timeline as profoundly problematic. There are some discrepancies in his testimony, but he was specifically asked on page 289 of Excerpt 3 when he had this connection with Mr. War Club, and he said before the labs. And so that is the evidence that we argued. It is of record, and it is there. It's in conflict with some of the other things he does say, but he says that. I totally agree with you. With respect to the money, and this is important because it is motive. The government used the money and this, a lot of cash that he never had before, as strong evidence of why this occurred. There were actually three witnesses, five who testified about the money, and three of them were interviewed in May of 2006. One of them, her testimony is corroborated by cell phone records, so we know specifically what day, the day of the murder. Let me say one of them. Which one are you referring to? That is Devereaux. Devereaux. Yes. So she knows whether she remembered or not when she was interviewed. They showed her cell phone records of when she called him, and she was able to place it by corroborating evidence. But Desi Garfield and Arlie Shields were interviewed in May of 2006, and this is important because the defense has said that Mr. War Club received a lot of money from a work comp settlement benefit. That actually occurred in August of 2006, not July. That is excerpt of Record 5 at page 688, so it was four months after the murder. But these people are being interviewed four months before he actually got that settlement, and their observations are that he had more money than he normally did. There is this was a circumstantial case, no doubt about it. And with respect to the hair and fiber, it would be wonderful to have fingerprints or something on the knife that we did not have. But in the testimony of the nuclear DNA forensic examiner, she does give percentages. It's a test of exclusion, and she is trying to exclude. In fact, she excluded Dick and Tom Green. And she provides the percentages, which are pretty compelling. Dick and Tom Green, as I understand it, are themselves Caucasians, right? They're not Indians? They are. No. All are Native American. What did you ask me? I'm sorry. I asked you whether the Green brothers are Caucasians. They are Caucasians. Yes. Yes. I apologize. I didn't hear you. So she provides percentages, and it is a test of exclusion. And I understand your concern. Certainly the government would like stronger forensic evidence, but we had a bunch of it adding together to give a strong factual basis for the jury to find what they did. So turning to what the defense has said is an error upon the district court in terms of attenuation. At the time that this topic was addressed by the defendant, there weren't any questions from Richard to Richard Kumslast on cross-examination about this theory, aside from his connection to Tom Green. But there was no foundation laid there whatsoever. So put yourself in the shoes of the district court and the government. Say some more about no foundation. We have a proffer. Now, that is, okay, that is after Richard Kumslast testified and was excused as a witness. Well, but the timing of the proffer is determined by the judge. It certainly is. But Richard Kumslast testified. Nothing was brought up by the defendant about this conspiracy motive theory. He's excused. But if you read the opening argument to the jury, it's right there on the opening argument. I understand. But opening argument is not evidence. No, I understand that. But if you're trying to say there's no foundation laid in the sense of the understanding what the theory of the case is, not evidence, but theory of the case, that's been the theory of the case including the involvement of the brother Tom from the beginning. Everybody knows that. If they were listening to the opening argument, they knew that. We understood that. But the district court is in a position of looking at evidence. Gail Green was not on a witness list. She was not called to testify by the defense. So bringing this and characterizing it as something that was 2 years old, that was never any evidence the defense was going to present. So this was the foundation. I understand what you're saying. You can say whatever you want in an opening statement. You may elect not to pursue the theory at some great risk, I suppose. Sure. But let's assume that there should have been foundation. What foundation is missing that should have been brought out? They should have tried to prove their case going after Richard Green, excuse me, Richard Kumplast, and that he explore his relationship and all of that. There should have been more there, Judge Fisher. There was certainly questions vigorously cross-examined about his connection, his connection to the murder, his motive to murder Dick Green, his opportunity to murder Dick Green. But what we're talking about is putting in evidence of Tom Green's murder, to murder through Richard Kumplast. And there were no questions about that. Well, what would you ask? In other words, there's no discovery in this case. So what is he supposed to ask a witness? And give him a chance to deny. You don't know the answer to the question. You don't ask it on cross-examination. Well, how would he have gone wrong by saying, Mr. Kumplast, you had an agreement with Mr. Green to murder his brother, and here's what. Okay, what if he says no to that? You still have, you know, you're still present. That is being foundational. You're presenting the district judge with some of your thinking as to why he should put in this evidence that is so far attenuated. There was ‑‑ it was nothing at that point. But I do want to turn to something else. I have trouble saying that, you know, because he doesn't ask questions of that, if that's your foundational argument, asking that of the witness, when you want to set up your theory through Tom Green, who is the one who had the grudge. Now, I agree, but you could then, having laid it out, go after Tom Green and show that Tom Green had an agreement. You could get at the other party to the agreement. And on the relevance, you want to hold your offer of proof until you've got the witness that you want to spring it on on the stand. Why would he have to give his offer of proof on Tom Green and that whole theory when Tom Green is not the witness on the stand? There needed to be some connection to Richard Cumm's last and Tom Green's intent in the record before the district court was going to allow this evidence to come in. There was nothing at that point. Whether that was the way to do it or there was some other way, how about just simply hold over Richard Cumm's last, call Tom Green again in your case in chief, call Gail Green? He wasn't foreclosed from presenting. But what more did he have to get out of Richard Cumm's last if he got the evidence in on Green? You absolutely do. If he had called Tom Green in his case in chief, you don't know what answers would have been given there. There was no foundation. I'm sorry. This cross occurred during the government's case in chief.  Okay, so Tom Green gets on the stand. What I want to show, and I have an offer of proof to back it up from an investigative report, I want to show that, as the story has been laid out here, that Tom Green had a motive to kill his brother. I've laid the foundation about Richard Cumm's last because I've put him at the scene, I've put in all of the evidence, or it's already come in, about Richard Cumm's last opportunity to execute, so to speak. I'm going to now go after Tom Green and lay the basis for arguing Tom Green, whose best friend was or father figure, who was the father figure to Richard Cumm's last. And now I've got the elements to go to the jury and say, Richard Cumm's last has the opportunity. Tom Green had the motive. I'm never going to get them to stand up there on a Perry Mason moment and admit they agreed to do this. But, jury, you can draw all the inferences. Well, Your Honor, I understand what you're saying, and that is the defense's argument. But looking at the record and when this came up, I can only emphasize the only evidence in the record was from opening statement. The district court was in a group. It was not evidence. I understand, and that's why I'm saying there's no evidence in the record. Well, there's no evidence in the record because you kept it out. Well, and I did object, and the district court agreed, and the reason being is I'll speak for the district court here as well as myself. There was just no evidence we believed in the record to allow this type of attenuated evidence in. But, you know, let me say something. I say this from time to time when we're dealing with criminal appeals and we're dealing with the prosecutor who has put us in a position that we don't like to be in, of you push pretty hard to get evidence in, and it's somewhat questionable. And your case is pretty strong without the evidence. Well, in this case it's a twist. We don't usually show them in this way. You push to keep some evidence out that you didn't want in. And it's clear you didn't want to be in, not because it's going to take some time, but because it's going to help their case. And your argument is that, of course, it's attenuated. It happened 30 years ago. That's what the district judge says. Well, only later is the district judge forced to confront. Maybe the district judge didn't know it. Maybe he'd forgotten it. Who knows? No, we're not talking about only 30 years ago. We're talking about the divorce that took place two years ago. I mean, you're pressing to keep evidence out that is somewhat helpful to the other side. Why not let it in, win your case, and you're spared all of this? I don't want to be in a position of having to second-guess the district judge on this one. Your Honor, I understand that. And all I can tell you is in this case, this evidence in the view of the United States was highly prejudicial, not to our case. Yeah, prejudicial usually means prejudicial to somebody who's actually a litigant in the case. I understand. We have Mr. Green on the stand. We have Dick Green. We have his family members in the courtroom. It's highly prejudicial, and there's no evidentiary connection. There's cases in this. The rules of evidence, when we're talking about prejudicial, we're not talking about whether it's uncomfortable for the witness to answer the question. I understand that, Your Honor. But we have an obligation as the government not only to push hard for our own case, but if we truly believe that the evidence has no evidentiary connection to make the objection. And in this case, that's what was done. And there are cases that ---- I just want to say ---- I understand. There was some connection. You might want to think, and you were able to persuade the district judge that it was too attenuated, but there was some connection, and they wanted it in for a reason. And you wanted it out, I think, for exactly the correspondingly opposite reason. I understand, Your Honor. But there are cases cited in our brief. And in this circuit, Walters, the People v. Guam case, the Etcity case, where the district court made this same type of decision about evidence, and this court affirmed that exclusion because there was no evidentiary connection. And looking at it from your perspective now, you do have to look at the strength of the evidence as well and whether this ---- Let me ask you a question on the strength of the other evidence. I think we've gone through much. Oh, sorry. Can I just ---- You keep calling it attenuated. But what the district court did in this case is cut off the proffer and not allow the explanation of the divorce factor. It, the district court, ruled on the assumption it was a 30-year-old event. But the critical relevance of the divorce was it made it a 2-year-old event. So we don't know what the district court, if he had that, had just let the proffer come out, would have made the same ruling or not. Well, the ---- You're telling us all about foundation and why you're speaking for the district court, but we don't have that. Did the district court cut off the offer of proof on a time-based judgment, which is reasonable if you didn't have the divorce? But the divorce is there, and that does change the picture. It was there to a certain extent, Judge Fischer. If you look at when this was opened in Tom Green's cross-examination, that's exactly how it started out, was during the divorce of Gail, there is an issue that came up. So I can't say that the court was aware of the time frame, but he was aware that it was part of a divorce proceeding, and then the topic came up in that context. In talking about the strength of the evidence, a couple of other things, the phone call that we're talking about and the timing of the phone call and whether it's suspicious or has any evidentiary value about the timing. Well, the United States would probably agree that it would be highly suspicious if the call was made during the day before the body was found to Tom Green. I killed him. The deed is done. I'm telling my co-conspirator. In this instance, he's calling his brother to tell him that he's just heard that there's a body in the garage and they've been looking for his brother all day. And the timing of that in the record is pretty quick because he was. That phone call by itself, I think, does nothing for the defendant. The defendant isn't making that argument. The defendant is arguing that phone call combined with the fact that the 911 call was after instead of before. That's their argument. Right. And I just don't think it goes there for the defense. There's not a big time frame there. He said he was 5 to 10 minutes away. So these phone calls were made within 5 to 10 minutes. And he called his brother. He didn't call a co-conspirator that's not related. Well, that's the government's position. Let me ask you this. As I try to assess sort of the overall factual scenario, harmless error and so on, it seems to me that there's some hearsay admitted here in terms of whether the victim was afraid of War Club because of his increasing demands for money and so on. That seems to me that that was improperly admitted. Well, here you go. Do you agree with that? There's no hearsay exception that allows it. At the time. In other words, just in short, it was improperly admitted. Well, yes. You have lots of other good evidence, but I want to make sure that we're on the same page as to whether that was in or out properly. It is. It should not have been admitted. But here is the problem and what the district court believed as well as the government at the time. And then in hindsight, which sometimes is very telling, it doesn't seem to hold water. The statements came through and it wasn't started with a question to relay the conversation. It was in response to do you have any information that you had any problems with this person or this person, anybody else, War Club. And that came in in Stacey Green's testimony and it worked perfectly. And then unfortunately, I get to a witness where instead of answering my question, she is starting to relay the conversation. Objection. I want to make sure where I'm going with this. I'm not in any way suggesting improper conduct on your part. Nor am I even talking about whether or not the admission of that hearsay sort of upsets the balance in the trial that that requires reversal. Now, where I'm going is a slightly different place and maybe a little subtler. Okay. And I'm trying to figure out the impact of what I think was an error on the part of the district judge, which was to say to cut off the cross-examination of Tom Green, to try and figure out against what backdrop of evidence do I assess that. Do I assess it against the evidence that properly came in only rather than against. Yes. That's right, because as we've written in our brief, there is an abundance of motive evidence and it was cumulative. I didn't need it. I just want to say, Your Honor, because this was a mistake of the government that the district court was led into. I understand that you make this error for the district court, but the district court admitted that not for the truth of the matter asserted, but for the fact that the statement was made and gave limiting instructions. And still at the time it seemed, and I still understand that, although to explain to you why that's permissible, I can't find it in the rules. But it seems to me that there is, and the district court believed that there was value in the fact that those statements were made. Yet in looking at the case law, it just doesn't tie up. But you can take it out of the equation because there was other evidence of motive. Now, I realize we're taking you over. And this is, in a way, neither here nor there to the questions that are legally appealed in front of us. I did notice you had some snitch testimony in there. We did have some. I want to finish. Excuse me. Jailhouse snitches as a breed are unreliable. This one looks to me particularly unreliable. And it's distressing to see the government relying on snitch testimony that is so almost demonstrably self-interested and unreliable. I mean, sometimes you have to rely on snitch testimony. You have no choice and so on. But this one just smells bad. Well, I understand what you're saying because the judge allowed the testimony of Mr. Duggar in, even though we tried to keep him out. And that's why you tried to keep him out. You said you don't want the snitch to testify? No, no, no, no. Mr. Bacon was the snitch. And then there was testimony about how he had manufactured this whole thing and was trying to get Mr. Duggar to go along with him as well. And that Mr. Duggar was totally discredited. It became one of the reasons why the government wanted Mr. Duggar out. It became a total corollary issue. I understand your concern with snitch testimony, and the government has that concern as well. But in this case, there were facts known by Mr. Bacon that made him more reliable to us than just the normal snitch. He knew about the alibi defense, the fact that Mr. War Club was going to say that he couldn't have done it because he was putting his son on the bus before the government did. It was days after that that we then got an alibi notice from the defense for that. So that seemed to us to lend credibility to him, that this had to come from War Club. We just got a filing from the defense saying that that was going to be their alibi. We do take it seriously when we're putting on people like that. Your Honors, we believe the conviction should be affirmed because any errors that the defense could find here would be harmless in the face of the evidence that we present. But if we were to find that the constitutional violation is that the district judge improperly prevented Mr. War Club from putting on his defense, the standard by which we use harmless error is it has to be harmless beyond a reasonable doubt? That is correct, Your Honor. That is correct. And I do – By another standard, this is an easy case for you. With that standard, that's what makes this a hard case for me. It's harmless beyond a reasonable doubt. But, again, that is why I did start this argument with trying to explain some of the maybe misconceptions of the record. There was some strong evidence here. Okay. Thank you. Response? Very briefly, Your Honor. Harmless error beyond a reasonable doubt. The background is the crime scene photos. We place Combs Last there. Richard Green was doing the exact – the very thing that he was supposed to be doing when Combs Last was supposed to be there under the crime scene photos. And I think there is clear reasonable doubt there. The connection between the excluded evidence and the crime scene photos is Richard Combs Last's own testimony that he would do any job for Tom Green except electricity. That's the connection. And if the district court had allowed us to bring in this cross-examination of what occurred and how he was divorced because of that, I think that we would have been able to argue motive, we would have been able to argue intent, and I think doubt would have existed. Okay. Thank you both. Thank you both sides for your testimony. I know that in the past the U.S. attorneys, AAUSAs, have trouble getting authorization to come to court, and I'm glad you came. I think that's in the past. The United States versus the War Club. Thank you both. Thank you. Nice work on both sides. Thank you. We're now adjourned for the day. Thank you.
judges: Bury, Fletcher W. , Fisher